**Charles Leon KOLBE and Karen Sue Kolbe, Husband and Wife, Appellants,**

v.

**STATE of Iowa, Appellee.**

**No. 99–0876.**

Supreme Court of Iowa.

April 25, 2001.

Wythe Willey of Wythe Willey Law Office, Cedar Rapids, for appellants.

Thomas J. Miller, Attorney General, Robin G. Formaker and Richard E. Mull, Assistant Attorneys General, for appellee.

LAVORATO, Chief Justice.

The issue here is whether the State is liable to an injured party for the State's negligence in issuing a driver's license to the person who caused the injury with his vehicle. The district court sustained the State's motion for summary judgment, concluding the State owed no duty to the injured party. We agree and affirm.

## I. Background Facts and Proceedings.

On June 28, 1997, Justin Allen Schulte, while driving a motor vehicle, struck Charles Leon Kolbe, who was riding a bicycle at the time. The accident occurred on Sac County road D–54 in Sac County, Iowa. As a result of the accident, Kolbe suffered severe injuries.

Schulte was driving with a restricted license, which required him to wear corrective lenses. Additionally, he was not to operate a motor vehicle in excess of forty-five miles per hour.

Schulte has a vision condition known as Stargardt's disease. Stargardt's disease results in loss of central vision and decrease in sharpness of peripheral vision. The disease is inherited and begins between the ages of 8 to 20. 2 J.E. Schmidt, M.D., *Attorney's Dictionary of Medicine and Word Finder* S–198 (1991). At the time of the accident, Schulte was eighteen.

One of Schulte's physicians, Dr. Alan Kimura, reported to the Iowa Department of Transportation (IDOT) that Schulte had Stargardt's disease and that the disease caused difficulty with central vision. At the time of this report, Dr. Kimura was an associate professor in the Department of Ophthalmology at University of Iowa Hospitals and Clinics. Dr. Kimura had diagnosed Schulte as having Stargardt's disease while Schulte was in the sixth grade.

The Stargardt's disease did not prevent Schulte from leading an active life. For example, he participated in high school athletics, did family farm chores, and worked for a construction company as a skid loader operator. He also completed a driver's education course in high school and received a "B plus" grade.

The IDOT first issued Schulte a driver's license in 1995. To receive the license, Schulte underwent a process that permitted the IDOT to issue him a license on a "discretionary basis." As part of this process, Schulte obtained recommendations from eye specialists, who performed eye examinations before recommending he receive a driver's license. The IDOT forwarded information from the eye specialists to a medical advisory board. The board is a group of doctors selected by the Iowa Medical Society to serve anonymously as an independent source of medical review for the IDOT. The doctors all recommended issuance of a driver's license to Schulte.

As part of the process, the IDOT subjected Schulte to testing. One test consisted of an oral knowledge exam. The other was a driver's test in which Schulte had to ride with an IDOT officer in town and in the country. During that ride, Schulte had to identify road signs and vehicles on the road.

The IDOT tested Schulte again in June 1996 and on June 23, 1997—five days before the accident in question. In both instances, Schulte successfully completed a driving test with an IDOT officer. Each time Schulte had to drive during daylight, dusk, and at night in rural areas upon the highway and in the city.

In May 1998, Charles Kolbe and his wife Karen Sue filed suit against the State of Iowa and the IDOT. They alleged, among other things, that the defendants "negli-

gently and without adequate investigation issued driving privileges" to Schulte, which negligence was a proximate cause of the accident and injuries. Karen Sue asked for loss of spousal consortium. The Kolbes later dropped the IDOT as a defendant.

Later, the district court sustained the State's motion for summary judgment. The court ruled that the State was immune from suit under the discretionary function exception of the State Tort Claims Act, *see* Iowa Code § 669.14(1) (1997). The court also ruled that the State owed no duty to the Kolbes.

On appeal, the Kolbes contend that the State has no such statutory immunity. They also contend that the State has a statutory and regulatory duty not to issue a driver's license to a person it knows or should know is, by reason of mental or physical disability, incapable of operating a motor vehicle safely. They further contend that the State breached this duty. In the alternative, the Kolbes contend the State has a common law duty to exercise ordinary care when it issues a driver's license. In this case, they contend the State breached that duty. Because we conclude there was no such duty, we need not address the immunity issue. *See Engstrom v. State,* 461 N.W.2d 309, 314 (Iowa 1990) (holding that State Tort Claims Act creates no new cause of action but merely recognizes and provides remedy for those already existing).

## II. Scope of Review.

■ We review a ruling granting a motion for summary judgment for correction of errors at law. *See Knudson v. City of Decorah,* 622 N.W.2d 42, 48 (Iowa 2000). Summary judgment is appropriate when

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.

Iowa R.Civ.P. 237(c).

■ When we review a summary judgment ruling, "we examine the record before the district court to decide whether any material fact is in dispute and whether the district court correctly applied the law." *Knudson,* 622 N.W.2d at 48. We view the evidence in the light most favorable to the nonmoving party—in this case, the Kolbes—and they are "entitled to every legitimate inference that can be reasonably deduced from the evidence." *Id.*

■ Additionally, this case involves issues of statutory construction. "Such issues raise legal questions and are properly resolvable by summary judgment." *Id.*

■ Furthermore, "because the existence of a duty is a question of law for the court, it may appropriately be adjudicated on a motion for summary judgment." *Van Essen v. McCormick Enters. Co.,* 599 N.W.2d 716, 718 (Iowa 1999).

## III. Duty.

■■ To prove their negligence claim, the Kolbes must establish (1) the State owed them a duty; (2) the State breached or violated that duty; (3) this breach or violation was a proximate cause of their injuries; and (4) damages. *See Sanford v. Manternach,* 601 N.W.2d 360, 370 (Iowa 1999); *Marcus v. Young,* 538 N.W.2d 285, 288 (Iowa 1995). When determining the existence of a duty, we are guided by "legislative enactments, prior judicial decisions, and general legal principles." *Sanford,* 601 N.W.2d at 370.

In their petition, the Kolbes raised a variety of allegations that essentially accuse the State of (1) failing to suspend or

revoke Schulte's driving privileges, (2) failing to require additional testing, (3) issuing a license when Schulte allegedly could not complete minimum testing requirements, (4) relying upon the advice of "unqualified" persons in determining whether to issue a license, and (5) issuing a license to Schulte when the State knew or should have known that Schulte could not safely operate an automobile.

These allegations involve a combination of asserted claims of negligence by the State in *failing* to perform statutory duties and *performing* such duties with lack of due care.

The Kolbes first assert the State has a statutory and regulatory duty not to issue a driver's license to an applicant who, by reason of mental or physical disability, is incapable of operating a vehicle safely. They contend the State breached this duty, which they assert is derived from Iowa Code section 321.177(7) (1995) and Iowa Administrative Code rule 761—600.4(2).

In the alternative, the Kolbes contend that common law imposes on the State a duty to exercise ordinary care when it issues a driver's license, and that in this case the State failed to exercise such care.

We begin with the Kolbes' contention that the State had a statutory and regulatory duty which it breached, and which breach gave rise to an actionable claim of negligence.

### A. Statutory and regulatory duty.

■ As mentioned, the Kolbes rely on Iowa Code section 321.177(7) and Iowa Administrative Code rule 761—600.4(2). Iowa Code section 321.177(7) provides that the IDOT "shall not issue a motor vehicle license ... [t]o any person when the director [of the IDOT] has good cause to believe the person by reason of physical or mental disability would not be able to operate a motor vehicle safely." Iowa Code § 321.177(7).

Iowa Administrative Code rule 761—600.4(2) similarly provides:

The [IDOT] shall not knowingly license any person who is unable to operate a motor vehicle safely because of physical or mental disability until that person has submitted a medical report stating that the person is physically and mentally capable of operating a motor vehicle.

Iowa Admin. Code r. 761—600.4(2). This rule appears intended to implement Iowa Code section 321.177(7). *See* Iowa Admin. Code r. 761—600.4.

Without conceding it breached the duty imposed under Iowa Code section 321.177(7) as implemented by Iowa Administrative Code rule 761—600.4(2), the State argues that even if it had, such breach does not necessarily give rise to a cause of action. We agree. *See Seeman v. Liberty Mut. Ins. Co.*, 322 N.W.2d 35, 37–38 (Iowa 1982) (holding that a private cause of action does not arise solely from the violation of a statutory duty).

■ A "violation of a statutory duty gives rise to a tort claim only when the statute, explicitly or implicitly, provides for such a cause of action." *Sanford*, 601 N.W.2d at 371. Absent such a provision, the violation of a statutory duty does not give rise to a private cause of action. *See Marcus*, 538 N.W.2d at 288–89.

■ There is no provision expressly providing a cause of action for violation of Iowa Code section 321.177(7) or Iowa Administrative Code rule 761—600.4(2). We therefore must employ the following four-factor test to determine whether a private cause of action against the State may be implied from the statute:

(1) Is the plaintiff a member of the class for whose benefit the statute was enact-

ed? (2) Is there any indication of legislative intent, explicit or implicit, to either create or deny such a remedy? (3) Would allowing such a cause of action be consistent with the underlying purpose of the legislation? (4) Would the private cause of action intrude into an area over which the federal government or a state administrative agency holds exclusive jurisdiction?

*Marcus,* 538 N.W.2d at 288; *accord Sanford,* 601 N.W.2d at 371. If any one of these factors is not satisfied, there is no implied cause of action. *See Sanford,* 601 N.W.2d at 372; *Marcus,* 538 N.W.2d at 288–89; *Engstrom,* 461 N.W.2d at 316. Additionally, "[i]f we do not imply a cause of action for statutory violations, we likewise refuse to imply a tort from the violation of a rule enacted to carry out statutory directives." *Engstrom,* 461 N.W.2d at 316.

To resolve the issue, we address only the second factor, which is the most relevant inquiry here: Is there any indication of legislative intent, explicit or implicit, to either create or deny such a remedy? As mentioned, there is no express indication of legislative intent to create a remedy, i.e., recovery of money damages for violation of Iowa Code section 321.177(7).

▮ In determining whether there is any indication of legislative intent to implicitly create a cause of action, we have previously considered the purpose for which the statute was created. *See Unertl v. Bezanson,* 414 N.W.2d 321, 325–26 (Iowa 1987); *Seeman,* 322 N.W.2d at 42. The subsection of Iowa Code chapter 321 in which section 321.177(7) is located clearly deals with regulatory matters pertaining to motor vehicle licenses. For example, the subsection covers (1) who is and who is not eligible for motor vehicle licenses, (2) driver education courses, (3) instruction permits, (4) driver's permits, (5) driver's license applicant examinations, (6) the types of licenses which may be issued and their contents, (7) fees for licenses, and (8) expiration and renewal of licenses. *See* Iowa Code §§ 321.174–.200. These provisions clearly suggest that Iowa Code section 321.177(7) was intended to be a regulatory measure designed to do nothing more than simply limit the driving privileges of those who are incapable of operating a motor vehicle safely. It is devoid of any suggestion of a private remedy. *See Unertl,* 414 N.W.2d at 326 (holding that provisions intended as regulatory measures did not create cause of action).

▮ Because we do not imply a cause of action for a violation of Iowa Code section 321.177(7), we likewise refuse to imply such an action for the violation of rule 761—600.4(2) implemented to carry out this statutory provision. *See Engstrom,* 461 N.W.2d at 316. This is consistent with the clearly established law that administrative rules cannot go further than the law permits. *Iowa Nat'l Indus. Loan Co. v. Iowa State Dep't of Revenue,* 224 N.W.2d 437, 441 (Iowa 1974).

We conclude Iowa Code section 321.177(7) and rule 761—600.4(2) provide the Kolbes with no right of action against the State. This still leaves for our consideration, however, their contention that they have a common law claim against the State.

### B. Common law duty.

▮ The Kolbes contend that common law imposes on the State an affirmative duty to exercise ordinary care to avoid injury to persons in carrying out the functions it undertakes, whether or not those functions are mandated by statute or regulation.

Applying this reasoning here, the Kolbes argue that the statutory and administra-

tive mandates that govern the licensing of motor vehicle operators in Iowa are for the benefit of a particularized class—rightful users of the Iowa roads. The Kolbes assert that they were members of this class at the time of the accident and for that reason the State owed them a legal duty to act with due care in carrying out such statutory and administrative mandates. They further assert that failure of the IDOT to adhere to those statutory and administrative mandates, and to otherwise act with care, creates a legal duty owed to them by the State.

The issue boils down to whether the State owed a legal duty to the Kolbes to exercise due care when it issued a driver's license to Schulte.

 In determining whether a defendant owes a legal duty to the plaintiff, three factors usually govern our analysis: (1) the relationship between the parties, (2) reasonable foreseeability of harm to the person who is injured, and (3) public policy considerations. *See J.A.H. v. Wadle & Assocs., P.C.*, 589 N.W.2d 256, 258 (Iowa 1999).

> We use these factors under a balancing approach and not as three distinct and necessary elements. In the end, whether a duty exists is a policy decision based upon all relevant considerations that guide us to conclude a particular person is entitled to be protected from a particular type of harm.

*Id.* (citation ommitted.)

 A linkage of a legal duty to a particular relationship between the parties is not always a requirement for actionable negligence. *See Keller v. State*, 475 N.W.2d 174, 179 (Iowa 1991). For example, such a linkage is not required when the direct consequences of a negligent act cause harm to another. *Id.* Such linkage, however, is required "for most claims

based on an alleged failure of a [defendant] to aid or protect another person or to control the conduct of a third party." *Id.; see also* Restatement (Second) of Torts § 314 cmt. c (1965) (explaining the origin of the requirement).

Restatement (Second) of Torts section 315 is the general rule pertaining to an alleged failure of a defendant to aid or protect another person or to control the conduct of a third party. The rule provides:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

Restatement (Second) of Torts § 315. We have applied the rule on several occasions. *See, e.g., J.A.H.*, 589 N.W.2d at 258; *Leonard v. State*, 491 N.W.2d 508, 510 (Iowa 1992); *Sankey v. Richenberger*, 456 N.W.2d 206, 209 (Iowa 1990).

Here, the Kolbes are asserting a legal duty by virtue of an asserted special relationship between the State and them that gives them the right of protection. They do not claim a specific individualized relationship between the State and them, but rather claim membership in a specific group or class—the traveling public, or as they phrase it, the "rightful users of the roads." We note that the Kolbes do not claim a special relationship arising out of the unique or particularized facts of this case, but rather claim such a relationship is created or conferred by Iowa Code chapter 321, and in particular Iowa Code section 321.177(7).

The State disputes the assertion that these motor vehicle statutes create or confer such a special relationship. The State further contends that what we have here is nothing more than a duty owed to the general public and that by virtue of the "public duty doctrine," breach of such duty is not actionable. The Kolbes respond that even if the statutes do not confer or create a special relationship, the public duty doctrine has been eliminated in this state, and therefore they are not precluded from pursuing an action for breach of a general duty.

The public duty doctrine provides that "if a duty is owed to the public generally, there is no liability to an individual member of that group." *Wilson v. Nepstad,* 282 N.W.2d 664, 667 (Iowa 1979). The Kolbes contend that this court discarded this doctrine in *Wilson* and in *Adam v. State,* 380 N.W.2d 716 (Iowa 1986).

We agree with the State's contention that this court did not discard the public duty doctrine in *Wilson.* Although *Wilson* addressed the continued viability of that doctrine in Iowa, the court never resolved the question. Rather, the court concluded the doctrine did not bar the plaintiff's suit because the statutes and ordinances in question *were not designed to protect the general public,* but rather were designed to protect a "special, identifiable group of persons." *Wilson,* 282 N.W.2d at 672. We confirmed this reading of *Wilson* in *Sankey,* 456 N.W.2d at 209.

However, in *Adam,* this court rejected the State's invocation of the doctrine. The court expressly concluded that the public duty doctrine was incompatible with the State Tort Claims Act. *Adam,* 380 N.W.2d at 724. However, a close reading of *Adam* shows that it was unnecessary to reach this conclusion because as in *Wilson,* the statute at issue in *Adam* was not for the benefit of the general public but rather "was for the benefit of the class to which plaintiffs belong[ed]—producers doing business with grain dealers." *Id.* at 723. Given the court's statements rejecting the public duty doctrine were not necessary to resolve the issue before it, we think those statements were dictum. Thus, in *Adam,* as in *Wilson,* we did not conclusively reject the doctrine, but rather only concluded that because of the nature of the statute in question, the doctrine did not bar plaintiffs' claim.

Since *Wilson* and *Adam,* we have not expressly abolished the public duty doctrine, although we have narrowed its application. We have routinely held that a breach of duty *owed to the public at large* is not actionable *unless the plaintiff can establish, based on the unique or particular facts of the case, a special relationship between the State and the injured plaintiff* consistent with the rules of Restatement (Second) of Torts section 315. *See Sankey,* 456 N.W.2d at 209. Our holdings have been "consistent with the principle that public employees share the same—but not greater—liability to injured parties as other defendants under like circumstances." *Id.* The duty to the public can either arise from a statute or from the State's obligation to protect the public at large. *See Fitzpatrick v. State,* 439 N.W.2d 663, 667 (Iowa 1989) (holding that although State had duty to keep felons in custody which obligation flowed to the public at large, State had no legal duty to police officer injured by parolee given lack of special relationship between State and victim).

We agree with the State that the licensing provisions in Iowa Code chapter 321, and more specifically Iowa Code section 321.177(7), are for the benefit of the public at large. Accordingly, we reject the Kolbes' contention that they can avoid the

preclusive effect of the public duty doctrine by claiming membership to a special, identifiable group for whose benefit the statutes were enacted. Furthermore, as mentioned, the Kolbes do not claim a special relationship arising out of the particular facts of this case. For these reasons, we conclude that there are no facts establishing a special relationship upon which the Kolbes' claims of liability may be premised.

 Additionally, we think public policy considerations support our determination that the State is not liable for negligently issuing a driver's license when there is no special relationship existing between the State and the victim. We reach this conclusion even though it is reasonably foreseeable such negligent action might result in harm to a highway user.

One such policy consideration is that our rule is consistent with the principle that the State "shares the same—but not greater—liability to injured parties as other defendants under like circumstances." *Sankey,* 456 N.W.2d at 209; *see also* Iowa Code § 669.2(3)(a) (providing that under the State Tort Claims Act, the State's exposure in tort does not go beyond that of a private person).

A recognition of the tort for "negligent issuance of a driver's license" would likely chill the State's licensing determinations, making it unreasonably difficult for certain segments of our society to secure a driver's license. Senior citizens with declining vision and visually impaired citizens, both of whom would ordinarily pass existing stringent state requirements, would face the possibility of not driving at all.

A similar policy consideration prompted one court to refuse to recognize the tort of negligent issuance of a driver's license. *See Ryan v. State,* 420 A.2d 841, 843 (R.I. 1980). At issue in that case was a statute that allowed the State to reinstate revoked licenses of those drivers whom it considered safe. *Id.* In refusing to recognize a duty running from the State to individual members of the public for negligently reinstating a driver, the court said:

> In enacting [the statute] the Legislature intended to empower the [State] to withhold reinstatement after examining the applicant's driving record. Thus, the statute clearly has as its purpose the protection of the public at large. We are unable to conclude, however, that the Legislature intended to create a duty running to individual members of the public. We are not convinced that the Legislature intended such a drastic result when it enacted [the statute]. *Furthermore, such a drastic remedy would likely deter the [State] from reinstating any drivers under [the statute].*

*Id.* (citations omitted) (emphasis added).

In *Johnson v. Indian River School District,* the court noted that allowing the tort of negligent issuance of a driver's license "would generate a drastic expansion of liability" and "[s]ince the [m]otor vehicle field is highly regulated by state statute, such a significant policy change, if warranted, should be made by the General Assembly, not the courts." 723 A.2d 1200, 1203 (Del.Super.Ct.), *aff'd,* 723 A.2d 397 (Del.1998). Here, the motor vehicle field is similarly highly regulated. We too think the policy decision to impose liability should be the legislature's choice, not ours.

## IV. Disposition.

In sum, we conclude that neither statutory nor common law gives rise to an actionable claim for negligent issuance of a driver's license. Accordingly, the district court was correct in sustaining the State's motion for summary judgment.

**AFFIRMED.**